[No. 12236–3–I.   Division One.   January 25, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. ERNEST J. ELLISON, *Appellant.*

*Julie Kesler* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney, Michael Schwartz* and *Michael Linnabary, Deputies,* and *Gary White, Legal*

*Intern,* for respondent.

DURHAM, C.J.—Ernest J. Ellison, a juvenile, appeals his conviction of first degree murder while armed with a deadly weapon that was also a firearm. We affirm.

On January 7, 1982, Ronald Blaha was shot twice in the head and killed while driving his cab. On January 8, fingerprints were recovered from the cab, and on April 20 and 22, the fingerprints were identified as those of George Vaughn and Ernest Ellison, respectively. On July 20, Ellison was charged with one count of premeditated murder and first degree felony murder, and Vaughn was charged with one count of second degree felony murder, to which he pleaded guilty.

On April 22, the police arrested Ellison at his home. Ellison was read his *Miranda* rights, and he stated that he knew nothing in response to police inquiries about the killing. When taken to the King County Youth Service Center, Ellison was again read his rights, and was confronted with an inculpatory statement by Vaughn. Ellison again said he didn't know what the police were talking about. When confronted with the fingerprint report and Vaughn's statement, he replied that they were "very interesting." At the CrR 3.5 hearing, the trial court held that Ellison had waived his *Miranda* rights and that the statements would be admissible at trial.[1]

At trial, Vaughn testified that he and Ellison were together on January 7, 1982, and discussed robbing a cabdriver. Ellison showed Vaughn a gun and indicated that if somebody interfered with him he had "something for all these suckers". Ellison hailed Blaha's cab, and the two agreed to the robbery with Ellison saying he was going to "burn" the cabdriver and "ditch" him. Ellison sat behind Blaha, who had to stop the cab because he was unable to

---

[1]The trial court also granted the State's motion in limine to exclude the results of three polygraph exams given to Vaughn. Two of the tests yielded ambiguous results, and one test indicated that Vaughn was lying.

negotiate an icy hill. When Blaha turned around to collect his fare, Ellison shot him.

In an earlier statement given to the police on April 21, Vaughn indicated his knowledge of the shooting when the police told him that he would be charged with first degree murder. This statement was inconsistent with his trial testimony in many respects. Most importantly, at trial Vaughn did not mention any discussions with Ellison about committing a robbery. Accordingly, the defense used the prior statement to impeach Vaughn at trial. The prosecution then attempted to rehabilitate Vaughn by introducing a statement he had made to the police on July 14, in which he told them of the planned robbery. This statement was made after Vaughn had been offered a plea bargain, a condition of which was that Vaughn testify against Ellison. Both the April 21 and July 14 statements were admitted.

Ellison first claims that the trial court erred in admitting Vaughn's July 14 statement as a prior consistent statement. He argues that prior consistent statements are admissible to bolster credibility only if the statement was made when the witness had no motive to fabricate. Thus, as the July 14 statement was made only after Vaughn became aware of the possibility of a plea bargain, it was error to admit it.

ER 801(d)(1)(ii)[2] states that prior consistent statements are not regarded as hearsay if (1) the declarant testifies at trial and is subject to cross examination; and (2) the statement is offered to rebut an implied or express charge that the declarant's trial testimony is a recent fabrication or is the product of improper influence or motive. No other requirements are mentioned in the rule.

---

[2]ER 801 provides in relevant part:

"**(d) Statements Which Are Not Hearsay.** A statement is not hearsay if—

"(1) *Prior Statement by Witness.* The declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is . . . (ii) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . . ."

■ Prior to the adoption of the Rules of Evidence, however, Washington courts consistently held that prior consistent statements were admissible only if they were made at a time the declarant did not have a motive to fabricate. *See, e.g., State v. Bray,* 23 Wn. App. 117, 125, 594 P.2d 1363 (1979); *State v. Epton,* 10 Wn. App. 373, 377, 518 P.2d 229 (1974). The rationale for this limitation is that a statement made by a witness when its use to meet a claim of recent fabrication is foreseeable does not tend to disprove the charge of recent fabrication. *See Sweazey v. Valley Transp., Inc.,* 6 Wn.2d 324, 335, 107 P.2d 567, 111 P.2d 1010, 140 A.L.R. 1 (1940).

The State contends that the instant case is governed solely by ER 801(d)(1)(ii), and that the above described limitation no longer applies. We disagree. Although the rule does not expressly state that prior consistent statements must be made at a time when there is no motive to fabricate, neither does it purport to abolish this requirement. On its face, ER 801(d)(1)(ii) simply renders prior consistent statements used to rehabilitate an impeached witness immune from hearsay challenges. *See* 5A K. Tegland, Wash. Prac. § 342 (2d ed. 1982). The rule does not state that such statements are inherently reliable.

Several considerations support the argument that evidence of a motive to fabricate should continue to render the prior consistent statement inadmissible. First, the Washington Supreme Court has never indicated that rule 801(d) either impliedly or expressly overruled prior case law. Indeed, in construing rule 801(d), the court quite recently cited cases that articulate the motive to fabricate rule. *See Thomas v. French,* 99 Wn.2d 95, 103, 659 P.2d 1097 (1983) (citing *Sweazey* and *Bray*). Second, the official comments to the Rules of Evidence do not indicate that the drafters intended to eliminate the motive to fabricate rule.[3] Finally,

---

[3]The comment states only that "[s]ubsection (d)(1)(ii) makes statements admissible as substantive evidence which were previously admissible only to rehabilitate an impeached witness." Comment, ER 801(d)(1)(ii).

most of the federal decisions interpreting Fed. R. Evid. 801(d)(1)(B), which is identical to the Washington rule, have concluded that the motive to fabricate rule continues to apply. *See* 5A K. Tegland § 342. Thus, we conclude that a prior consistent statement meeting the requirements of ER 801(d)(1)(ii) is nonetheless inadmissible if it is tainted by a motive to fabricate.

The State relies heavily on *State v. Smith*, 30 Wn. App. 251, 633 P.2d 137 (1981), *aff'd*, 97 Wn.2d 801, 650 P.2d 201 (1982) to support its position that only the requirements set forth in ER 801(d)(1)(ii) need be met to admit a prior consistent statement. Although the court stated that prior consistent statements were used there "in rebuttal to the charge of fabrication", *Smith,* at 255, it did not inquire whether they were tainted by a motive to fabricate, and looked exclusively to rule 801(d) for guidance. However, there was no indication that the prior consistent statement used in *Smith* was made at a time when the declarant could foresee its potential usefulness to buttress trial testimony.

The July 14 statement here, however, was made well after the prosecutor had offered Vaughn a plea bargain. The prosecutor apparently offered the plea bargain in order to procure Vaughn's trial testimony. Thus, it cannot be said that the July 14 statement was made at a time when Vaughn had no motive to fabricate.[4]

■ However, the error was harmless. Defense cross examination brought out the fact that Vaughn made a statement after learning of a plea bargain before the State even introduced the July 14 statement. Because defense counsel did not allege any contradiction between the July 14 statement and Vaughn's trial testimony, the jury must have become aware that the July 14 statement was roughly consistent with it. Error of nonconstitutional magnitude is prejudicial only if, within reasonable probabilities, the outcome of the trial would have been materially affected

---

[4]The fact that the statement was made only 1 week before trial strongly suggests the possibility that Vaughn could foresee its usefulness.

absent the error. *State v. Cunningham,* 93 Wn.2d 823, 831, 613 P.2d 1139 (1980). The actual admission of the statement could not have materially affected the trial outcome under these circumstances.

■ Ellison next contends that the trial court erred by refusing to allow the defense to impeach Vaughn with the results of his polygraph examinations. We disagree. Washington courts have consistently held that polygraph results are inadmissible absent stipulation by the parties. *See, e.g., State v. Grisby,* 97 Wn.2d 493, 502, 647 P.2d 6 (1982), *cert. denied,* 459 U.S. 1211 (1983); *State v. Young,* 87 Wn.2d 129, 131, 550 P.2d 1 (1976). In *State v. Woo,* 84 Wn.2d 472, 475, 527 P.2d 271 (1974), the Washington Supreme Court suggested that it might ignore this rule if presented with a record sufficient to evaluate the reliability of polygraph tests. Nothing in this record demonstrates the reliability of polygraph tests generally or of Vaughn's in particular.

Appellant appears to contend, however, that the admissibility of polygraph results to impeach key State witnesses is compelled by the confrontation clause. U.S. Const. amend. 6. He argues that the Sixth Amendment entitles criminal defendants to cross-examine adverse witnesses as to all relevant matters, and that the Washington Supreme Court has itself conceded, in *State v. Renfro,* 96 Wn.2d 902, 906, 639 P.2d 737, *cert. denied,* 459 U.S. 842 (1982), that polygraph results are "reliable enough to be relevant."

Although the appellant's argument has never been addressed in this state,[5] the federal courts have almost uniformly held that the exclusion of polygraph evidence favorable to the defendant does not result in the denial of a fair trial. *See, e.g., United States v. Black,* 684 F.2d 481, 483–84 (7th Cir.), *cert. denied,* 495 U.S. 1043 (1982); *United States*

---

[5]In *State v. Bartholomew,* 98 Wn.2d 173, 654 P.2d 1170 (1982), *cert. denied,* 103 S. Ct. 3548 (1983), the Supreme Court rejected an argument that the prosecution is required under the due process clause to disclose exculpatory polygraph evidence, at least where the defendant fails to request it before trial. The court did not, however, address the question of the *admissibility* of polygraph tests. *See Bartholomew,* at 207, 209.

*v. Gordon,* 688 F.2d 42, 44–45 (8th Cir. 1982); *Jackson v. Garrison,* 677 F.2d 371, 373 (4th Cir. 1981). It would be anomalous to conclude that the admission of such evidence for impeachment purposes is required by the confrontation clause, and we decline to so hold.

Ellison also alleges that the trial court erred in allowing the State to impeach him with his post–arrest statement in which he denied knowledge of the murder. Again, we disagree. Whether a juvenile has effectively waived his *Miranda* rights depends upon the totality of the circumstances surrounding the interrogation. *Fare v. Michael C.,* 442 U.S. 707, 725, 61 L. Ed. 2d 197, 99 S. Ct. 2560 (1979); *Dutil v. State,* 93 Wn.2d 84, 87, 606 P.2d 269 (1980). These circumstances include the juvenile's age, intelligence, background, and his capacity to effect a voluntary waiver. *State v. Jones,* 95 Wn.2d 616, 625, 628 P.2d 472 (1981). The voluntariness of a waiver need not be shown beyond a reasonable doubt, but only by a preponderance of the evidence. *State v. Davis,* 34 Wn. App. 546, 550, 662 P.2d 78 (1983); *State v. Gross,* 23 Wn. App. 319, 323, 597 P.2d 894 (1979). Furthermore, a waiver of *Miranda* rights may be inferred when a defendant voluntarily discusses the charged crime with police officers and indicates an understanding of his rights. *Gross,* at 324.

Here, although the circumstances are somewhat conflicting, they nonetheless lead to the conclusion that Ellison effectively waived his *Miranda* rights. It is true that Ellison's mother testified that Ellison had an 11th grade education, that he was in a special education program, and had particular difficulties with reading and comprehension. At trial, Ellison proved unable to spell simple words, and was unable to understand his rights at first when explained to him at the CrR 3.5 hearing. Moreover, Ellison did not sign a waiver form, and the police never specifically asked him if he wished to waive his right to counsel or his right to remain silent.

However, Ellison was read his *Miranda* rights upon his initial arrest and after he was taken to the Youth Service

Center. On the first occasion, Ellison specifically acknowledged that he understood his rights. No coercion was employed, and Ellison seemed to have no trouble understanding his rights. At this point Ellison said that he did not know what the police were talking about when asked if he knew anything about the murder. Ellison was again read his rights at the Youth Center, and initialed each right on the *Miranda* form card. Again, he appeared to understand his rights. Ellison was then confronted with Vaughn's statement and replied that he did not know what the police were talking about. The fingerprint report and Vaughn's statement elicited the response, "very interesting."[6]

The foregoing supports the conclusion Ellison at least had the capacity to waive his *Miranda* rights, and that his statements were made knowingly and voluntarily. Ellison, however, contends that his statements evidenced an attempt to invoke his *Miranda* rights, not waive them. It is argued that his statements constituted an exercise of the right to remain silent, and were, therefore, inadmissible for impeachment purposes under *Doyle v. Ohio,* 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). This argument is meritless.

*Doyle* held that the post–arrest silence of an accused cannot be used for impeachment purposes because silence in the face of *Miranda* warnings is "insolubly ambiguous." *Doyle,* at 617. But Ellison did not remain silent after receiving the warnings. As the trial court recognized, Ellison's statements were, if anything, largely exculpatory. On each occasion when given his *Miranda* warnings, Ellison neither requested counsel nor asked that questioning cease. Although constitutional rights need not be invoked by any particular phrase or formula, *see In re Keene,* 95 Wn.2d 203, 215, 622 P.2d 360 (1980) (Utter, J., concurring), Ellison's statements contain no mention whatsoever of an

---

[6]Moreover, although Ellison initially expressed confusion upon being read his rights at the CrR 3.5 hearing, he later acknowledged his understanding after the trial judge readvised him.

invocation of rights. Accordingly, Ellison's statements were admissible to impeach his trial testimony.[7]

Ellison next argues that the trial court erred by instructing the jury on premeditation as an alternative method of committing first degree murder. He asserts that there was no evidence supporting premeditation, and that Vaughn's testimony, at best, indicated that they intended to commit a robbery. We find no merit to this argument.

▮ Before the jury can be instructed and allowed to consider alternative means of committing the crime alleged, there must be sufficient evidence to support the instructions. *State v. Bartholomew,* 98 Wn.2d 173, 212, 654 P.2d 1170 (1982), *cert. denied,* 103 S. Ct. 3548 (1983). The test is "'whether, after viewing the evidence most favorable to the State, any rational trier of fact could have found the essential elements [of the case] beyond a reasonable doubt.'" (Italics omitted.) *Bartholomew,* at 212–13, quoting *State v. Green,* 94 Wn.2d 216, 221–22, 616 P.2d 628 (1980).

Ellison contends that there was insufficient evidence to support a charge of premeditated murder under this standard. He is mistaken. The time required for premeditation may be very short, provided that it is an "appreciable" period of time within which the defendant may form an intent. *State v. Griffith,* 91 Wn.2d 572, 577, 589 P.2d 799 (1979); *State v. Russell,* 33 Wn. App. 579, 591, 657 P.2d 338, *review granted,* 99 Wn.2d 1012 (1983). Vaughn testified that Ellison displayed a pistol shortly before entering the cab, and that he specifically discussed the possibility of robbing a cabdriver. After displaying the gun, Ellison told Vaughn he had "something" for anyone who gave him trouble.[8] Ellison also apparently shot the cabdriver when it

---

[7]No Washington cases have examined if statements such as Ellison's constitute an invocation of *Miranda* rights. But the federal cases on this issue indicate that they do not. *See, e.g., United States v. Kimball,* 555 F. Supp. 1366 (D. Me. 1983); *United States v. Nanez,* 694 F.2d 405 (5th Cir. 1982), *cert. denied,* 103 S. Ct. 1884 (1983).

[8]Vaughn also testified that Ellison said that "if somebody f—— with him, he

became clear he would have to pay a fare. Finally, there were two bullet wounds, and the gun was fired very close to the head. This is certainly enough to satisfy *Green.*

Ellison also claims that the trial court erred by refusing to instruct the jury that it must unanimously agree on the means by which he committed the crime. He argues that, where the commission of a specific underlying crime is necessary to sustain a conviction for a more serious statutory offense, jury unanimity as to the underlying crime is necessary. Thus, because the felony murder alternative required proof of robbery or attempted robbery, jury unanimity was required as to the underlying crime. Again, we disagree.

When a defendant is charged under a criminal statute that describes a single offense committable in more than one way, rather than separate and distinct offenses, jury unanimity is unnecessary as to the means but only as to the commission of the offense. *State v. Arndt,* 87 Wn.2d 374, 376, 553 P.2d 1328 (1976); *State v. Wixon,* 30 Wn. App. 63, 76, 631 P.2d 1033 (1981). Determining if a statute describes multiple offenses or a single offense committable in different ways depends upon

[1] the title of the act; [2] whether there is a readily perceivable connection between the various acts set forth; [3] whether the acts are consistent with and not repugnant to each other; [4] and whether the acts may inhere in the same transaction.

*Arndt,* at 379, quoting *State v. Kosanke,* 23 Wn.2d 211, 213, 160 P.2d 541 (1945).

Here, Ellison was charged with premeditated murder, RCW 9A.32.030(1)(a), and felony murder, RCW 9A.32-.030(1)(c), both of which constitute first degree murder. *See* RCW 9A.32.030.[9] In *State v. Russell, supra,* this court held

got something for him now." When cautioned by Vaughn, Ellison apparently replied: "F—— all that . . . I got something for all these suckers."

[9]RCW 9A.32.030 states in relevant part:

"Murder in the first degree. (1) A person is guilty of murder in the first degree when:

"(a) With a premeditated intent to cause the death of another person, he

that second degree murder, RCW 9A.32.050(1)(a) and second degree felony murder, RCW 9A.32.050(1)(b), are alternative methods of committing the same crime under the *Arndt* test. The court noted that both second degree murder and felony murder were placed under the same title, "Murder in the Second Degree". *Russell*, at 586. The court also acknowledged the readily perceivable connection between the two crimes; *i.e.,* causing another person's death. Moreover, the court noted that the two crimes are not repugnant to one another, in the sense that proof of one offense would not disprove the other. *Russell*, at 586. All of these factors are present with respect to first degree murder and felony murder.

Appellant relies heavily on *State v. Green,* 94 Wn.2d 216, 616 P.2d 628 (1980). In *Green,* the defendant was charged with aggravated murder in the first degree, which at that time, required that the victim be killed in furtherance of or in the course of a rape or kidnapping. The court previously had held that it was permissible for the trial court to have not required unanimity as to the rape and kidnapping elements, relying on *Arndt. See Green,* at 232. The court abandoned this position, however, holding that *Arndt* was inapposite because the offenses of rape and kidnapping are themselves separate and distinct offenses. It stated that

> [w]here, as here, the commission of a specific underlying crime is necessary to sustain a conviction for a more serious statutory criminal offense, jury unanimity as to the underlying crime is imperative.

*Green,* at 233. However, the court went on to point out that there was no substantial evidence supporting the kidnapping element. Thus, without a unanimous verdict, it was impossible to know if the jury had based its aggravated murder conviction on *invalid* grounds. *See State v. Franco,*

causes the death of such person or of a third person; or . . .

"(c) He commits or attempts to commit the crime of . . . (1) robbery, in the first or second degree . . ., and; in the course of and in furtherance of such crime or in immediate flight therefrom, he, or another participant, causes the death of a person other than one of the participants; . . ."

96 Wn.2d 816, 824, 639 P.2d 1320 (1982). Here, however, both the felony murder and premeditated murder theories were supported by sufficient evidence. The lack of jury unanimity does not entail the same danger as was present in *Green*. Accordingly, the trial court did not err in failing to require it.

Finally, Ellison contends that the trial court gave the jury prejudicially repetitive instructions thereby denying him a fair trial. This argument is without merit. In general, the number of instructions given on any point rests in the trial court's discretion. *State v. Williams*, 22 Wn. App. 197, 200, 588 P.2d 1201 (1978). We have reviewed the instructions complained of and find that they are neither unduly repetitive nor prejudicial. *See Samuelson v. Freeman*, 75 Wn.2d 894, 897, 454 P.2d 406 (1969).

The judgment is affirmed.

ANDERSEN and CORBETT, JJ., concur.

Review denied by Supreme Court April 6, 1984.