UNITED STATES, Appellee

v.

Edward G. SCHEFFER, Airman
U.S. Air Force, Appellant.

No. 95–0521.
Crim.App. No. 30304.

U.S. Court of Appeals for
the Armed Forces.

Argued May 8, 1996.

Decided Sept. 18, 1996.

For Appellant: *Captain Michael L. McIntyre* (argued); *Colonel Jay L. Cohen* and *Captain Del Grissom* (on brief); *Lieutenant Colonel Joseph L. Heimann.*

For Appellee: *Major Jane M.E. Peterson* (argued); *Colonel Jeffery T. Infelise* (on brief).

*Opinion of the Court*

GIERKE, Judge:

A general court-martial composed of officer members at March Air Force Base, California, convicted appellant, contrary to his pleas, of uttering bad checks, wrongfully using methamphetamine, failing to go to his appointed place of duty, and absenting himself from his unit for 13 days without authority, in violation of Articles 123a, 112a, and 86, Uniform Code of Military Justice, 10 USC §§ 923a, 912a, and 886, respectively. The adjudged and approved sentence provides for a bad-conduct discharge, confinement for 30 months, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence but awarded one day of credit for lack of timely pretrial confinement review, relying on *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), and *United States v. Rexroat,* 38 MJ 292 (CMA 1993). *See* 41 MJ 683, 693 (1995); *see also* RCM 305(k), Manual for Courts–Martial, United States (1995 ed.).

We granted review of the following issue: WHETHER THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION TO PRESENT EVIDENCE OF A FAVORABLE POLYGRAPH RESULT CONCERNING HIS DENIAL OF USE OF DRUGS WHILE IN THE AIR FORCE.

In March of 1992, appellant began working as an informant for the Air Force Office of Special Investigations (OSI). During late March and early April, appellant told OSI that two civilians, Davis and Fink, were dealing in significant quantities of drugs. On April 7, 1992, at the request of OSI, appellant voluntarily provided a urine sample. Periodic urinalyses are normal procedure for controlled informants.

On April 10, OSI asked appellant to submit to a polygraph examination. The OSI polygraph examiner asked appellant three questions: (1) Had he ever used drugs while in the Air Force; (2) had he ever lied in any of the drug information he gave to OSI; and (3) had he told anyone other than his parents that he was assisting OSI? Appellant answered "No" to each question. The polygraph examiner concluded that "no deception" was indicated.

Appellant's urinalysis tested positive for methamphetamine. The report was dated May 20, although local OSI agents may have learned of the results as early as May 14.

At trial appellant asked the military judge for an opportunity to lay a foundation for the favorable polygraph evidence. The military judge denied the request without receiving any evidence, ruling that "the President may, through the Rules of Evidence, determine that credibility is not an area in which a factfinder needs help, and the polygraph is not a process that has sufficient scientific acceptability to be relevant." He further ruled that under Mil.R.Evid. 403, Manual for Courts–Martial, United States (1995 ed.),

> [t]he factfinder might give it too much weight, and ... there is an inordinate amount of time and expense, especially in the cases where there may be conflicting tests, which doesn't appear to be the case here. The main confusion of the issue; that is, the question of what the result of the polygraph was, as opposed to the question of whether or not the accused used drugs [is another problem].

During the trial on the merits, appellant testified that he visited Davis on April 6, left Davis' house around midnight, and began

driving toward March Air Force Base. The next thing he remembered was waking up the next morning in his car in a remote area, not knowing how he got there. He denied "knowingly" ingesting drugs at any time between March 5, when he began working for OSI, and April 7, the date he provided the urine sample that tested positive for methamphetamine.

Trial counsel cross-examined appellant about inconsistencies between his trial testimony and earlier statements to the OSI and about his lack of a "sudden rush of energy" and other symptoms of ingesting methamphetamine. Trial counsel's closing argument urged the court members to look at appellant's credibility. Trial counsel argued, "He lies. He is a liar. He lies at every opportunity he gets and he has no credibility. Don't believe him. He knowingly used methamphetamine, and he is guilty of Charge II."

Appellant asserts that Mil.R.Evid. 707 violated his Sixth Amendment right to present a defense because it compelled the military judge to exclude relevant, material, and favorable evidence offered by appellant. He argues that he was constitutionally entitled to be given an opportunity to rebut the attack on his credibility as a witness by laying a foundation for favorable polygraph evidence. The Government asserts that the Rule does not impermissibly infringe on the Sixth Amendment. It argues that Mil. R.Evid. 707 merely codifies all the evidentiary prohibitions against polygraph evidence and that, even without Mil.R.Evid. 707, polygraph evidence would never be admissible. We agree with appellant.

In *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), polygraph evidence was held to be inadmissible because it was unreliable. In *United States v. Gipson* 24 MJ 246, 253 (CMA 1987), our Court held that an accused is "entitled to attempt to lay" the foundation for admission of favorable polygraph evidence. In arriving at that holding, our Court acknowledged that Mil.R.Evid. 702 "may be broader and may supersede *Frye v. United States*," *supra*. 24 MJ at 251. The impact of our *Gipson* decision was short-lived, however, because on June 27, 1991, the President

promulgated Mil.R.Evid. 707 in Executive Order No. 12767, § 2, 56 Fed.Reg. 30296.

Mil.R.Evid. 707 provides: "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence." Unlike most military rules of evidence, Mil.R.Evid. 707 has no counterpart in the Federal Rules of Evidence. It is similar to Cal.Evid.Code 351.1 (West 1988 Supp.). *See People v. Kegler*, 197 Cal.App.3d 72, 84, 242 Cal.Rptr. 897, 905 (1987). Mil. R.Evid. 707 "is not intended to accept or reject *United States v. Gipson*, 24 MJ 246 (CMA 1987), concerning the standard for admissibility of other scientific evidence under Mil.R.Evid. 702 or the continued vitality of *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923)." Drafters' Analysis of Mil.R.Evid. 707, Manual, *supra* (1995 ed.) at A22–48.

Presidential authority to promulgate rules of evidence is founded on Article 36(a), UCMJ, 10 USC § 836(a). That Article provides that such rules "shall, so far as [The President] considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter."

■ Appellant's case presents two questions. The first is a statutory question: Did the President comply with Article 36 when he promulgated Mil.R.Evid. 707? The second is a constitutional question: Does Mil.R.Evid. 707 violate the Sixth Amendment? We review these questions of law *de novo*. *United States v. Ayala*, 43 MJ 296, 298 (1995).

The statutory question was neither briefed nor argued. It may well be that the *per se* prohibition in Mil.R.Evid. 707 is "at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.' " *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588, 113 S.Ct. 2786, 2794, 125 L.Ed.2d 469 (1993). We note that the majority of the federal circuits do not have a *per se* prohibition against polygraph evi-

dence. Instead, they rely on the trial judge to apply a *Daubert* analysis and apply Fed. R.Evid. 401–03. *United States v. Pulido,* 69 F.3d 192, 205 (7th Cir.1995) (no *per se* rule against admissibility of polygraph evidence); *see United States v. Posado,* 57 F.3d 428, 436 (5th Cir.1995) (reversing *per se* exclusion of polygraph evidence); *United States v. Piccinonna,* 885 F.2d 1529, 1535 (11th Cir.1989) (holding that polygraph evidence not inadmissible *per se* ); *Anderson v. United States,* 788 F.2d 517, 519 n. 1 (8th Cir.1986) (polygraph evidence admissible by stipulation); *see also United States v. A & S Council Oil Co.,* 947 F.2d 1128, 1134 n. 4 (4th Cir.1991) (holding polygraph evidence not admissible in 4th Circuit but recognizing that "[c]ircuits that have not yet permitted evidence of polygraph results for any purpose are now the decided minority"). *But see United States v. Scarborough,* 43 F.3d 1021, 1026 (6th Cir. 1994) (polygraph results "inherently unreliable"); *United States v. Soundingsides,* 820 F.2d 1232, 1241 (10th Cir.1987) (polygraph evidence "not admissible to show" that witness "is truthful"); *United States v. Skeens,* 494 F.2d 1050, 1053 (D.C.Cir.1974) (adhering to *Frye* and holding polygraph evidence inadmissible); *Dowd v. Calabrese,* 585 F.Supp. 430 (D.D.C.1984) (polygraph results not sufficiently reliable to be admissible).

The Federal rules are virtually identical to Mil.R.Evid. 401–03. Whether the President determined that prevailing federal practice is not "practicable" for courts-martial cannot be determined from the record before us. Assuming without deciding that the President acted in accordance with Article 36 and determined that the prevailing federal rule is not "practicable" for courts-martial, we turn to the constitutional question.

Our Court entertained a direct attack on the constitutionality of Mil.R.Evid. 707 in *United States v. Williams,* 43 MJ 348 (1995). We held, however, "that the accused had no right to introduce the polygraph evidence without taking the stand and testifying consistently, or without offering some other plausible evidentiary basis." 43 MJ at 355. *See also United States v. Abeyta,* 25 MJ 97, 98 (CMA 1987) (polygraph evidence not relevant unless accused testifies). In *Williams*

we observed: "Thus, in the appropriate case, the question will be whether the proffered polygraph evidence is sufficiently reliable and necessary that its automatic exclusion violates the accused's constitutional trial rights." 43 MJ at 353.

■ Unlike Williams, this appellant testified, placed his credibility in issue, and was accused by the prosecution of being a liar. Thus the constitutional issue is squarely presented. We hold that Mil.R.Evid. 707, as applied to this case, is unconstitutional. A *per se* exclusion of polygraph evidence offered by an accused to rebut an attack on his credibility, without giving him an opportunity to lay a foundation under Mil.R.Evid. 702 and *Daubert,* violates his Sixth Amendment right to present a defense. We limit our holding to exculpatory evidence arising from a polygraph examination of an accused, offered to rebut an attack on his credibility. We leave for another day other constitutional questions such as those involving government-offered polygraph evidence or evidence of a polygraph examination of a witness other than an accused.

■ The Sixth Amendment grants an accused "the right to call 'witnesses in his favor.'" *Rock v. Arkansas,* 483 U.S. 44, 52, 107 S.Ct. 2704, 2709, 97 L.Ed.2d 37 (1987). An accused's right to present testimony that is relevant and material may not be denied arbitrarily. *Washington v. Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019 (1967); *see United States v. Woolheater,* 40 MJ 170, 173 (CMA 1994).

■ The right to present evidence, however, is not unlimited but "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973). *See, e.g., Washington v. Texas,* 388 U.S. at 23 n. 21, 87 S.Ct. at 1925 n. 21 (right to present testimony may be limited by testimonial privilege or rules relating to mental ability to testify). When restrictions are placed on an accused's right to present evidence, they "may not be arbitrary or disproportionate to the purposes they are designed to serve."

*Rock v. Arkansas,* 483 U.S. at 56, 107 S.Ct. at 2711. Applying the foregoing principles, the Supreme Court held in *Rock* that a *per se* rule excluding the defendant's hypnotically refreshed testimony infringed his right to present a defense. The Supreme Court held that a "legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case." 483 U.S. at 61, 107 S.Ct. at 2714. While *Rock* concerned exclusion of a defendant's testimony and this case concerns exclusion of evidence supporting the truthfulness of a defendant's testimony, we perceive no significant constitutional difference between the two. In either case, the Sixth Amendment right to present a defense is implicated.

■ Mil.R.Evid. 702 permits expert testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony is subject to the relevance requirements of Mil. R.Evid. 401 and 402 and the balancing requirements of Mil.R.Evid. 403. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 597, 113 S.Ct. at 2798, the Supreme Court made the trial judge a gatekeeper, trusted with responsibility to decide if novel scientific evidence was sufficiently relevant and reliable to warrant admission.

■ An expert witness may not testify that a declarant was telling the truth but may testify to the absence of indicia of deception. Thus, in *United States v. Cacy,* 43 MJ 214, 218 (1995), we held that it was not error to permit an expert to testify that a victim's accusation did not appear to be feigned or rehearsed. Similarly, in *United States v. Suarez,* 35 MJ 374, 376 (CMA 1992), we held that it was not error for an expert to opine that counter-intuitive conduct, such as recanting an accusation, inconsistent statements, or failing to report abuse is not necessarily inconsistent with a truthful accusation. *See also United States v. Houser,* 36 MJ 392, 398–400 (CMA 1993). Finally, we have permitted experts to opine whether a complainant "can differentiate between fantasy and fact." *United States v. Palmer,* 33 MJ 7, 12

(CMA 1991); *United States v. Tolppa,* 25 MJ 352, 354–55 (CMA 1987), *citing United States v. Azure,* 801 F.2d 336, 340 (8th Cir.1986). Under the same rationale as these cases, a properly qualified expert, relying on a properly administered polygraph examination, may be able to opine that an accused's physiological responses to certain questions did not indicate deception.

Polygraph examinations were relatively crude when *Frye* was decided. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 585, 113 S.Ct. at 2793. The Eleventh Circuit has recognized that, "[s]ince the *Frye* decision, tremendous advances have been made in polygraph instrumentation and technique." *United States v. Piccinonna,* 885 F.2d at 1532; *see also United States v. Galbreth,* 908 F.Supp. 877 (D.N.M.1995); *United States v. Crumby,* 895 F.Supp. 1354 (D.Ariz.1995). The effect of Mil.R. Evid. 707 is to freeze the law regarding polygraph examinations without regard for scientific advances. We believe that the truth-seeking function is best served by keeping the door open to scientific advances. *See United States v. Youngberg,* 43 MJ 379 (1995) (holding DNA evidence admissible); *United States v. Nimmer,* 43 MJ 252, 260 (1995) (remanding for hearing on reliability of hair analysis evidence). With respect to appellant's case, we, like the Fifth Circuit, cannot determine "whether polygraph technique can be said to have made sufficient technological advance in the seventy years since *Frye* to constitute the type of 'scientific, technical, or other specialized knowledge' envisioned by Rule 702 and *Daubert." United States v. Posado,* 57 F.3d at 433. We will never know, unless we give appellant an opportunity to lay the foundation.

■ Like the Court in *Posado,* "We do not now hold that polygraph examinations are scientifically valid or that they will always assist the trier of fact, in this or any other individual case. We merely remove the obstacle of the *per se* rule against admissibility." 57 F.3d at 434. Foundation evidence for proffered polygraph evidence must establish that the underlying theory—that a deceptive answer will produce a measurable

physiological response—is scientifically valid. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 592–93, 113 S.Ct. at 2796–97. Furthermore, we would expect evidence that the theory can be applied to appellant's case. *Id.* The foundation must include evidence that the examiner is qualified, that the equipment worked properly and was properly used, and that the examiner used valid questioning techniques.

■ As required by *Daubert,* the military judge must be a gatekeeper and weigh probative value against prejudicial impact in accordance with Mil.R.Evid. 403. We find the *Piccinonna* guidance apt:

> [T]he trial court may exclude polygraph expert testimony because 1) the polygraph examiner's qualifications are unacceptable; 2) the test procedure was unfairly prejudicial or the test was poorly administered; or 3) the questions were irrelevant or improper. The trial judge has wide discretion in this area, and rulings on admissibility will not be reversed unless a clear abuse of discretion is shown.

885 F.2d at 1537; *see also United States v. Pettigrew,* 77 F.3d 1500, 1514 (5th Cir. 1996) (judge's ruling on admissibility of polygraph evidence reviewed for abuse of discretion).

This was not a private, *ex parte* examination under unknown conditions. *See United States v. Sherlin,* 67 F.3d 1208, 1217 (6th Cir.1995) ("unilaterally" obtained and "privately commissioned" polygraph excluded). To the contrary, appellant proffers a government-initiated examination by an OSI examiner. Accordingly, there would appear to be no need to condition admissibility on having appellant examined by a polygraph examiner chosen by the prosecution. *See United States v. Piccinonna,* 885 F.2d at 1536.

Finally, the issues raised by the dissenting opinion warrant comment. Both *Wood v. Bartholomew,* —— U.S. ——, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995), and *State v. Ellison,* 36 Wash.App. 564, 676 P.2d 531, 535 (1984), involve polygraph examinations of prosecution witnesses, not the accused. Our holding, as was that in *Rock,* is limited to an accused's right to lay the foundation for a polygraph examination of himself. We need not and do not address admissibility of polygraph examinations of government witnesses or the question whether such polygraph evidence would be constitutionally required to be disclosed under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *But cf. United States v. Simmons,* 38 MJ 376 (CMA 1993) (trial counsel failed to discover and disclose contradictory statements of rape prosecutrix made to government polygrapher).

Furthermore, *Bartholomew* involves an issue different from the one in the case before us. It is summary disposition of a habeas corpus case, where the Supreme Court concluded that the Ninth Circuit misapplied the Court's *Brady* jurisprudence. —— U.S. at ——, 116 S.Ct. at 8. The Supreme Court noted that polygraph evidence was inadmissible under Washington state law but premised its holding on the speculative nature of the additional evidence that might have been discovered, counsel's concession "that disclosure would not have affected the scope of his cross-examination," and the "overwhelming" evidence of guilt. —— U.S. at ——, 116 S.Ct. at 10–11. The constitutionality of the state law was not before the Court and therefore, consistent with the Court's practice, it was not addressed. *See United Public Workers of America v. Mitchell,* 330 U.S. 75, 90 n. 22, 67 S.Ct. 556, 564 n. 22, 91 L.Ed. 754 (1947) ("It has long been this Court's 'considered practice not to decide abstract, hypothetical or contingent questions, ... or to decide any constitutional question in advance of the necessity for its decision, ... or to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied, ... or to decide any constitutional question except with reference to the particular facts to which it is to be applied.' ")

■ *Montana v. Egelhoff,* —— U.S. ——, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996), also involves a constitutional issue different from the one before us. *Egelhoff* involves legislative action redefining an element of an offense, not executive rule-making about modes of proof. The President, unlike the Montana legislature, lacks authority to create and define offenses. *See* Art. 36(a), UCMJ, 10 USC § 836(a); *United States v. Hemingway,* 36

MJ 349, 351 (CMA 1993); *United States v. Smith*, 13 USCMA 105, 119, 32 CMR 105, 119 (1962).

In *Egelhoff*, the Supreme Court upheld a statute excluding evidence of voluntary intoxication when a defendant's state of mind is at issue. The statute in question, Mont.Code Ann. § 45–2–203, provided that voluntary intoxication "may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense." —— U.S. at ——, 116 S.Ct. at 2016. The Supreme Court's decision is fragmented, with four Justices speaking in the plurality opinion, joined by Justice Ginsburg who concurred in the judgment separately; and four other Justices dissented in three separate opinions.

We read the holding in *Egelhoff* as founded on the power of the state to define crimes and defenses. The Montana statute was based on a legislative decision to resurrect "the common-law rule prohibiting consideration of voluntary intoxication" in determining whether the defendant had the requisite *mens rea*. —— U.S. at ——, 116 S.Ct. at 2020. In short, Montana decided to preclude voluntary intoxication from being asserted as a defense. The plurality explained:

"The doctrines of *actus reus, mens rea,* insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. This process of adjustment has always been thought to be the province of the States." *Powell v. Texas*, 392 U.S. 514, 535–536 [88 S.Ct. 2145, 2156, 20 L.Ed.2d 1254] (1968) (plurality opinion). The people of Montana have decided to resurrect the rule of an earlier era, disallowing consideration of voluntary intoxication when a defendant's state of mind is at issue. Nothing in the Due Process Clause prevents them from doing so, and the judgment of the Supreme Court of Montana to the contrary must be reversed.

—— U.S. at —— – ——, 116 S.Ct. at 2023–24.

The Montana rule excludes evidence based on the fact to be proven (voluntary intoxication) rather than on the mode of proof. Abolishing a defense is within the authority of a state legislature. On the other hand, Mil.R.Evid. 707 bars otherwise admissible and relevant evidence based on the mode of proof by categorically excluding polygraph evidence. While the plurality opinion in *Egelhoff* questioned whether the distinction between the fact to be proved and the method of proving it makes a difference, —— U.S. at —— n. 1, 116 S.Ct. at 2017 n. 1, only four Justices joined in that observation.

Justice Ginsburg pointed out in her separate concurrence in *Egelhoff* that the statute does not appear among Montana's evidentiary rules but in the chapter pertaining to substantive crimes. She opines that the Montana law is "a measure redefining *mens rea*" and, as such, is well within the power of a state to define crimes. —— U.S. at —— – ——, 116 S.Ct. at 2024–25. The four Justices in the plurality opinion state that they are "in complete agreement" with Justice Ginsburg's analysis. They explain that they "address [the statute] as an evidentiary statute simply because that is how the Supreme Court of Montana chose to analyze it." —— U.S. at —— – —— n. 4, 116 S.Ct. at 2020–21 n. 4. Justice Ginsburg, along with the four dissenters, recognized that "a rule designed to keep out 'relevant, exculpatory evidence' ... offends due process." —— U.S. at ——, ——, 116 S.Ct. at 2024, 2029.

Finally, we must comment on the dissenter's "floodgate" argument that our opinion will generate an unreasonable burden on the services. 44 MJ at 451. Apart from the speculative nature of such an argument, we think that it is just as likely that polygraph evidence will prevent needless litigation by avoiding some meritless prosecutions as well as smoking out bogus claims of innocent ingestion. Furthermore, we are unaware of any such flood of polygraph cases after our decision in *United States v. Gipson, supra.* Finally, our measure should be the scales of justice, not the cash register.

### Decision

The decision of the United States Air Force Court of Criminal Appeals is set aside.

The record of trial is returned to the Judge Advocate General of the Air Force for submission to an appropriate convening authority for a hearing before a military judge. Appellant will be provided an opportunity to lay a foundation for admission of the proffered polygraph evidence. If the military judge decides that the polygraph evidence is admissible, he will set aside the findings of guilty and the sentence, and a rehearing may be ordered. If the military judge decides that the polygraph evidence is not admissible, he will make findings of fact and conclusions of law. The record will be sent directly to the Court of Criminal Appeals for expeditious review. Thereafter, Article 67, UCMJ, 10 USC § 867 (1989), will apply.

Chief Judge COX and Senior Judge EVERETT concur.

SULLIVAN, Judge (dissenting):

I dissent for the reasons stated in my separate opinion in *United States v. Williams,* 43 MJ 348, 356–57 (1995) (Sullivan, C.J., concurring in the result).

CRAWFORD, Judge (dissenting):

We have held that "[t]he defendant has the right to present legally and logically relevant evidence at trial." *United States v. Woolheater,* 40 MJ 170, 173 (CMA 1994). But as all the Judges of this Court agreed in *Woolheater,* this is "not [an] absolute" right, *id.;* *see also Montana v. Egelhoff,* —— U.S. ——, ——, ——, 116 S.Ct. 2013, 2017, 2026, 135 L.Ed.2d 361 (1996); and may yield to valid "policy considerations," 40 MJ at 173; *id.;* *United States v. Bins,* 43 MJ 79, 84 (1995) (citing *Woolheater,* 40 MJ at 173); *United States v. Schaible,* 11 USCMA 107, 111, 28 CMR 331, 335 (1960).

None of the cases cited by the majority hold that there is a constitutional right to admit an exculpatory polygraph examination. Assuming polygraphs are relevant and reliable, there is ample justification for Mil. R.Evid. 707, Manual for Courts–Martial,

United States (1995 ed.). This justification satisfies the provisions of Article 36(a), Uniform Code of Military Justice, 10 USC § 836(a), that the rules of procedure and evidence "generally recognized" in federal trials be applied to courts-martial "so far as he [the President] considers practicable."

Through dicta and implicit holdings the Supreme Court has signaled that there is no constitutional right to introduce polygraph evidence. Exclusion of exculpatory evidence does not contravene fundamental "principle[s] of justice ... rooted in the traditions and conscience of our" society. *Patterson v. New York,* 432 U.S. 197, 202, 97 S.Ct. 2319, 2322, 53 L.Ed.2d 281 (1977).

In *McMorris v. Israel,* 643 F.2d 458 (1981), the Court of Appeals for the Seventh Circuit stated that "polygraph evidence [may be] materially exculpatory within the meaning of the Constitution." 643 F.2d at 462. In dissenting to the denial of *certiorari* in that case, then-Justice Rehnquist characterized *McMorris* as a "dubious constitutional holding." *Israel v. McMorris,* 455 U.S. 967, 970, 102 S.Ct. 1479, 1481, 71 L.Ed.2d 684 (1982).

In *Wood v. Bartholomew,* —— U.S. ——, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995), the Court summarily denied habeas corpus for the prosecution's failure to disclose information pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The basis for the defense allegation was that the prosecution failed to reveal polygraph examinations and statements by the defendant's brother and his girlfriend, the two key prosecution witnesses at trial.[1] These polygraphs and their statements would have undermined the witnesses' testimony at trial and supported the defense theory.

The defendant's brother testified at trial that, while he and his brother sat in the car in the laundromat parking lot, the defendant said "that he intended to rob the laundromat and 'leave no witnesses.'" The prosecution offered evidence that both the brother and girlfriend left a short while later and went to

---

1. This Court in the past has looked at *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its military counterpart as to its impact on prosecution witnesses as in *Wood v. Bartholomew,* —— U.S. ——, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995), and reversed a conviction. *United States v. Simmons,* 38 MJ 376, 380–82 (CMA 1993).

the girlfriend's house. The girlfriend also testified that when the defendant arrived at her house, he told her that he "put two bullets in the kid's head." She also heard the defendant "say that he intended to leave no witnesses." —— U.S. at —— – ——, 116 S.Ct. at 8–9.

At trial the defendant testified that he forced the attendant "to lie down on the floor." While removing the cash, he "accidently fired" a bullet into the victim's head. The defendant "denied telling" his brother and the girlfriend "that he intended to leave no witnesses." Moreover, he said that his brother "assisted" him. —— U.S. at ——, 116 S.Ct. at 9.

Under Washington State law, polygraph evidence is inadmissible. *State v. Ellison,* 36 Wash.App. 564, 676 P.2d 531, 535 (1984). Even so, prior to trial, the prosecution requested that the two key witnesses take a polygraph examination. The polygrapher noted that the girlfriend's answers to the "questions were inconclusive." The polygrapher asked the defendant's brother whether (1) he had "assisted" in the robbery and (2) whether at any time he was with his brother in the laundromat. The examiner said that his negative responses showed "deception." The prosecution did not disclose these examinations to defense counsel. —— U.S. at ——, 116 S.Ct. at 9. In denying relief because of failure to disclose the polygraph examinations, the Supreme Court noted that, during the habeas corpus hearing, "counsel obtained no contradictions or admissions" from the defendant's brother. —— U.S. at ——, 116 S.Ct. at 11. Clearly, if polygraph examinations were admissible, polygraph results would have impeached the witnesses. *Thus, the results on appeal would have been different.*

The implicit holding in *Wood* has been reinforced in *Montana v. Egelhoff,* —— U.S. ——, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996). In *Egelhoff* the Supreme Court held that a state may exclude evidence of voluntary intoxication as it relates to the *mens rea* element of a criminal offense. When interpreting Supreme Court decisions, it is instructive and helpful to look beyond the specific holding to the debate of broader principles of jurisprudence.

In *Egelhoff,* eight Justices agreed that there may be valid policy reasons to exclude relevant, reliable evidence. —— U.S. at ——, ——, 116 S.Ct. at 2017, 2026. While the eight Justices debated the "*Chambers* principle," *id.* at ——, 116 S.Ct. at 2022, Justice Ginsburg, concurring in the judgment, looked "[b]eneath the labels" in concluding that a state legislature's redefinition of *mens rea* "encounters no constitutional shoal." *Id.* at ——, 116 S.Ct. at 2024.

Justice Scalia, speaking for four other Justices, described *Chambers* as a "highly case-specific error correction" case as well as a "fact-intensive case." He concluded that there is no violation of a defendant's right of defense "whenever 'critical evidence' favorable to him is excluded"; on the other hand, "erroneous evidentiary rulings can, in combination, rise to the level of a due process violation." *Id.* at ——, 116 S.Ct. at 2022. The plurality then emphasized that Fed. R.Evid. 403 and 802 result in exclusion of relevant, reliable evidence. *Id.* at ——, 116 S.Ct. at 2017.

Justice O'Connor, dissenting and joined by three other Justices, agreed the "defendant does not enjoy an absolute right to present evidence relevant to his defense." *Id.* at ——, 116 S.Ct. at 2026. Her dissent rejected the plurality argument that because evidence of voluntary intoxication was excluded at common law, it should be excluded in this case. *Id.* at —— – ——, 116 S.Ct. at 2029–31. Justice O'Connor asserted that to exclude the evidence would prohibit a defendant from having a "fair opportunity to put forward his defense." *Id.* at ——, 116 S.Ct. at 2031. She emphasized that this concept was "universally applicable." *Id.* at ——, 116 S.Ct. at 2030. In any event, she concluded that the state had not set forth "sufficient justification," *id.* at ——, 116 S.Ct. at 2027, to exclude involuntary intoxication to negate the mental element of a defense. She agreed with Justice Ginsburg that a state could redefine an offense to render "voluntary intoxication irrelevant," but she concluded that the State of Montana did not evidence such an

intent. *Id.* at —, 116 S.Ct. at 2031. Justice O'Connor also rejected the plurality's characterization of *Chambers. Id.* at —– —, 116 S.Ct. at 2026–27.

Justice Souter agreed that the "plurality opinion convincingly demonstrates that ... the common law ... rejected the notion that voluntary intoxication might be exculpatory, or was at best in a state of flux...." *Id.* at —, 116 S.Ct. at 2032 (citation omitted). Thus, a state may "exclude even relevant and exculpatory evidence if it presents a valid justification for doing so." *Id.* at —, 116 S.Ct. at 2032.

However, in separate opinions, Justices Breyer and Souter stated that the State of Montana had not provided for exclusion of voluntary intoxication from the *mens rea* element of an offense. In summary, in *Egelhoff* eight Justices of the Court recognized that relevant, reliable evidence may be excluded if there is a valid policy reason for doing so.

Mil.R.Evid. 707 was "based on several policy grounds." The policy grounds set forth in the Drafters' Analysis are not exclusive. These grounds include the risk of being treated with "near infallibility"; "danger of confusion of the issues"; and a waste of time on collateral matters. Drafters' Analysis, Manual, *supra* (1995 ed.) at A22–48.

An additional policy concern is the impact in terms of practical consequences. Unfortunately, the majority overlooks the practical consequences of its decision on a worldwide system of justice. Our Court sees the cases that are at the end of a long funnel. There are approximately 4,000 general courts-martial per year. Annual Report, 39 MJ CXLVII, CLIX, CLXXIV, CLXXVII (1992–93). However, across the services, there are approximately 100,000 criminal actions per year. Statistically more than 20 percent of these involve drug cases like the present case. The majority fails to recognize that a concomitant right of presenting polygraph evidence is the right to demand a polygraph examination during the investigative stage.

This may well impose a practical impossibility on the services. Additionally, if an individual were accused of a minor crime for which she was to be given a captain's mast, she could claim a right to a polygraph examination.[2] Thus, the practical policy consequences set forth in the analysis established a valid governmental interest in precluding admissibility of polygraph examinations. This rule is not inconsistent with the rule in the Federal courts.

Professors Giannelli and Imwinkelried state, "A majority of jurisdictions follow the traditional rule, holding polygraph evidence inadmissible per se." P. Giannelli & E. Imwinkelried, *Scientific Evidence* § 8–3(A) at 232 (2d ed.1993 and 1995 Supp.) (citing many cases). Further, "[a] substantial minority of courts admit polygraph evidence upon stipulation of the parties." *Id.* § 8–3(B) at 236. But "[a] few courts recognize a trial court's discretion to admit polygraph evidence even in the absence of a stipulation." *Id.* § 8–3(C) at 240.

While the Federal courts are split as to admissibility of polygraphs, some, like *United States v. Posado,* 57 F.3d 428 (5th Cir. 1995), have admitted polygraph evidence at suppression hearings or pursuant to a stipulation. *United States v. Piccinonna,* 885 F.2d 1529, 1536 (11th Cir.1989). This is not unlike admitting hearsay at suppression hearings. In any event, the Federal courts have not faced the issue of a rule precluding admissibility of polygraph evidence in a worldwide system of justice. California, which does have a rule similar to the military and applies the *Kelly–Frye* (so named after *People v. Kelly,* 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976), and *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923)) test, has held that there is no constitutional right to introduce exculpatory polygraph examinations. *See, e.g., People v. Kegler,* 197 Cal. App.3d 72, 84–90, 242 Cal.Rptr. 897, 905–09 (1987).

---

2. *See, e.g., United States v. Bass,* 11 MJ 545 (ACMR 1981) (refusal to accept Article 15 resulted in a general court-martial and 8 years' confinement). There have been other instances where Article 15s have resulted in more serious dispositions. *See, e.g., United States v. Brock,* No. 96–0673, *pet. granted* (July 12, 1996); *United States v. Zamberlan,* 44 MJ 69 (1996).

Since Mil.R.Evid. 707 is based on valid policy grounds, it satisfies the Constitution and the requirement in Article 36(a) that the rules of procedure and rules of evidence conform to those in Federal trials "so far as he [the President] considers practicable." If one carried the view of the majority to its logical conclusion, it calls into question various procedural and evidentiary rules. *See, e.g.,* Mil.R.Evid. 502–12 and 803(6); RCM 305(h)(2)(B). Unfortunately this path reminds me of earlier forays by this Court. *See, e.g., United States v. Larneard,* 3 MJ 76, 80, 83 (CMA 1977); *United States v. Heard,* 3 MJ 14, 20 n. 12 (CMA 1977); *United States v. Hawkins,* 2 MJ 23 (CMA 1976); *United States v. Washington,* 1 MJ 473, 475 n. 6 (CMA 1976). *But see United States v. Newcomb,* 5 MJ 4, 7 (CMA 1978) (Cook, J., concurring).

To the extent the majority suggests that *Egelhoff* is distinguishable because it involves a legislative act rather than rulemaking by an executive, I have two responses. First, just as the Supreme Court treats Federal Rules of Criminal Procedure the same as statutes, so should we. *See, e.g., Bank of Nova Scotia v. United States,* 487 U.S. 250, 255, 108 S.Ct. 2369, 2373–74, 101 L.Ed.2d 228 (1988). Second, in *Loving v. United States,* — U.S. ——, ——, 116 S.Ct. 1737, 1748, 135 L.Ed.2d 36 (1996), the Supreme Court recognized that the President as Commander–in–Chief has been delegated "wide discretion and authority." The Court upheld the delegation of authority to the President to promulgate aggravating factors in a death-penalty case. *Loving* left open the question as to the extent of the President's authority under Article 36. *Id.* at ——, 116 S.Ct. at 1749.

For the aforementioned reasons, I dissent.