[No. 3156–2.   Division Two.   April 18, 1979.]

THE STATE OF WASHINGTON, *Respondent,* v.
GARY THOMAS BRAY, *Appellant.*

118

*Edward E. Younglove,* for appellant (appointed counsel for appeal).

*Patrick D. Sutherland, Prosecuting Attorney,* and *Edward F. Schaller, Deputy,* for respondent.

PEARSON, C.J.—Defendant, a 38–year–old male, was convicted of forcibly raping a slightly retarded 16–year–old female who lived with her stepmother in a separate unit of the same apartment complex in which he lived. RCW 9.79.190(1)(a).[1] The case was tried to the court with the

---

[1] RCW 9.79.190 states:

"Rape in the third degree. (1) A person is guilty of rape in the third degree when, under circumstances not constituting rape in the first or second degrees, such person engages in sexual intercourse with another person, not married to the perpetrator:

"(a) Where the victim did not consent as defined in RCW 9.79.140(6) to sexual intercourse with the perpetrator and such lack of consent was clearly expressed by the victim's words or conduct, or

victim as the principal witness. The evidence of intercourse was fairly conclusive; the central issue in the case was whether the victim clearly expressed her lack of consent by words or conduct. We hold she did and affirm the defendant's conviction.

On May 7, 1977, the victim, her stepmother, and her brother had dinner at defendant's apartment. This was the first and only time the victim had ever been in defendant's apartment and, as we read the record, the only time she had ever talked to him. The trial court found that the girl was "retarded to such an extent that her retardation was apparent to the defendant by her appearance and conduct." This finding is not challenged on appeal.

The stepmother and brother left the apartment around 8 p.m. The victim testified that after her family left, she helped the defendant wash dishes. She then tried to leave the apartment but defendant told her she could not. They talked for a while and defendant began kissing her. Again she asked to go home, and defendant refused. He then grabbed her by the wrist and held her while he went through the apartment turning off the lights. He carried her into his bedroom telling her, "I'll be good to you," and said he would take off his clothes if she would take off hers. When the girl did not take off her clothes, defendant took them off himself and removed his own pants. The girl again asked to go home and defendant told her, "Not until I'm through." Defendant proceeded to have vaginal intercourse with the victim whereupon she began to cry. Defendant then allowed her to get dressed and told her not to tell anybody what had happened.

The girl arrived at home around 9:15 p.m. and, according to her stepmother, looked "absolutely petrified," "pale," and "terrified." The stepmother asked what had happened

"(b) Where there is threat of substantial unlawful harm to property rights of the victim.

"(2) Rape in the third degree is a felony, and shall be punished by imprisonment in the state penitentiary for not more than five years."

and the girl replied, "Do you remember what happened with Daddy? Well, the same thing happened with Gary." The stepmother testified she took this to mean some sexual misbehavior had occurred. Her daughter also told her that defendant took her clothes off, would not let her go home, "stuck his finger between her legs and that he had hurt her breasts, because he had been rubbing her breasts and had laid upon her."

The stepmother took the girl to the emergency room of a local hospital around 10:30 p.m. Medical tests revealed the presence of sperm in the victim's vaginal tract, indicating she had had sexual intercourse within the preceding 24 to 48 hours. Tests run by the FBI lab on body fluids found in the victim and on her underpants showed that the person who had intercourse with her had type B blood (8 percent of the population). Subsequent testing of the defendant determined he had type B blood.

After the victim and her stepmother left the hospital, they reported the incident to the police. Two days later, they went to the county courthouse where the victim talked to an advocate of the Rape Relief organization and Detective Hansen of the Thurston County Sheriff's office. The Sheriff's office then arrested defendant and took a statement from him on May 11. In his statement, defendant acknowledged that he had had dinner with the victim and her family in his apartment on May 7, and that the victim remained behind after her family left. However, he denied having sexual relations with the girl and contended that she left his apartment "just a matter of minutes after her mother and the family left."

Defendant's first three assignments of error are patently frivolous. First, he argues that there is no substantial evidence to support the trial court's findings and conclusions that the victim clearly expressed her lack of consent. *See generally State v. Braxton,* 10 Wn. App. 1, 516 P.2d 771 (1973). We fail to see how the victim's repeated requests to be allowed to leave can be viewed as anything but a clear expression of lack of consent under the circumstances of

the case. There was no prior relationship between the defendant and the victim, the defendant was much bigger and older than the victim, she was slightly retarded and this fact was known to the defendant, and the defendant was the initiator of all of the activity to the point of leading the girl around the house by the wrist, carrying her into the bedroom, and removing her clothing when she did not follow his suggestion to do so herself. The evidence clearly manifests coercion rather than persuasion.

■ Defendant's second contention is that the trial court erred in allowing the stepmother to relate her daughter's statements made when the daughter returned home from defendant's apartment. Under the rule of *Beck v. Dye,* 200 Wash. 1, 92 P.2d 1113, 127 A.L.R. 1022 (1939), and *State v. Bloomstrom,* 12 Wn. App. 416, 529 P.2d 1124 (1974), the statements are unreflective utterances admissible as an exception to the rule against hearsay. Defendant argues that evidence admissible under this exception is limited to the fact of complaint and does not include other details communicated by the victim. *See generally* 5 R. Meisenholder, Wash. Prac. § 545 (1965); 11 Gonz. L. Rev. 340 (1975). This argument confuses the venerable "fact of complaint" rule with the excited utterance exception to the hearsay rule. The two rules are often cited interchangeably as a basis for admitting evidence of a victim's complaint in a rape case, yet each is distinct and subject to its own set of limitations.

The fact of complaint rule, first announced in *State v. Hunter,* 18 Wash. 670, 52 P. 247 (1898), provides that the prosecution in a forcible rape case may present evidence of the fact of the victim's complaint in its case in chief. The details and particulars of the complaint are not admissible. The evidence is not hearsay because it is introduced for the purpose of bolstering the victim's credibility and is not substantive evidence of the crime. *State v. Ragan,* 22 Wn. App. 591, 593 P.2d 815 (1979). The rule is grounded in the time–honored assumption that in forcible rape cases the absence of evidence of seasonable complaint creates an

inference that the victim's testimony has been fabricated. *State v. Griffin,* 43 Wash. 591, 86 P. 951 (1906). Allowing the State to present the fact of complaint in its case in chief dispels this inference. *See State v. Murley,* 35 Wn.2d 233, 212 P.2d 801 (1949).

To be distinguished from the fact of complaint rule is the excited utterance exception to the hearsay rule. *See* Rules of Evidence 803(a)(2), 91 Wn.2d 1117, 1165 (effective April 2, 1979). Under this exception, the fact of complaint as well as the attendant details are admissible provided the criteria of *Beck v. Dye* are complied with. Unlike the fact of complaint rule stated above, evidence that comes in under the excited utterance exception is substantive evidence of the crime charged. There is no doubt that the statements here fall squarely within the *Beck v. Dye* rule, and we hold that the statements were properly admissible.

■ Thirdly, defendant assigns error to the trial court's acceptance of defendant's oral waiver of jury trial. The record shows no written waiver was made as required by CrR 6.1(a). A long history of federal cases, *see e.g., United States v. Lane,* 479 F.2d 1134 (6th Cir. 1973); *United States v. Ricks,* 475 F.2d 1326 (D.C. Cir. 1973); *United States v. McCurdy,* 450 F.2d 282 (9th Cir. 1971); *Rogers v. United States,* 319 F.2d 5 (7th Cir. 1963), and a recent decision by our state Supreme Court, *see State v. Wicke,* 91 Wn.2d 638, 591 P.2d 452 (1979), *aff'g In re Reese,* 20 Wn. App. 441, 580 P.2d 272 (1978), make it clear that the purpose of the written waiver rule is to insure that defendant's waiver of jury trial is knowing, voluntary, and intelligent. Therefore, failure to obtain a written waiver is harmless error if there is other evidence in the record to establish the validity of the waiver. *State v. Wicke, supra.* The report of proceedings shows that prior to accepting defendant's waiver, the trial court engaged defendant and his counsel in an extensive colloquy concerning defendant's right to a jury trial. Consequently, we hold the waiver is valid.

Defendant's three remaining assignments of error all concern evidentiary rulings by the trial court: (1) the

refusal to admit evidence of the victim's prior sexual behavior, (2) the admission into evidence of defendant's statement to the police, and (3) the allowance of rebuttal testimony by the two prosecution witnesses regarding prior consistent statements by the victim.

Admissibility of evidence of a victim's prior sexual behavior is controlled by statute. RCW 9.79.150. It can generally be said that such evidence is inadmissible except on the issue of consent. *But see State v. Cosden*, 18 Wn. App. 213, 568 P.2d 802 (1977); Recent Developments, *Evidence*, 52 Wash. L. Rev. 1011, 1023–27 (1977). In order to introduce such evidence, the defense must first make an offer of proof in the form of a pretrial motion accompanied by an affidavit or affidavits. RCW 9.79.150(3)(a), (b). The trial court then has discretion to determine whether the offer of proof is sufficient such that a hearing outside the presence of the jury is warranted. RCW 9.79.150(3)(c).

■ In this case, the offer of proof consisted of an affidavit by defense counsel which stated:

> The defendant offers to prove that testimony of the victim on cross–examination and of the victim's mother would be that the victim engaged in sexual intercourse with her adoptive father, an older man, and that such intercourse took place with the [victim's] consent or without any clearly expressed lack of consent on the part of the victim.

In a discussion between the court and defense counsel, it was revealed that the acts in question occurred 3 years previous when the victim was too young to be capable of giving legal consent to sexual relations. For that reason, the trial court ruled that the evidence, even if true, was irrelevant. We agree with the trial court that a victim's sexual behavior prior to age 16 with a person other than the defendant has no bearing on the issue of consent in the current charge of rape because the victim was legally incapable of giving consent to the earlier conduct. To hold otherwise would undermine the rationale for the offense of statutory rape.

In argument to this court, defendant urges that the victim's prior sexual behavior is nevertheless relevant because the victim's "passive acceptance of an older man's sexual advances on a prior occasion infers passive acceptance of the alleged sexual intercourse with the defendant." Defendant's theory is interesting but appears to us to be highly speculative. Absent an offer of scientific proof for the proposition that child incest victims tend in adult life to submit passively to the sexual advances of older men, we must still agree with the trial court's conclusion that the offer of proof was insufficient. *See generally State v. Blum,* 17 Wn. App. 37, 46, 561 P.2d 226 (1977); *State v. Geer,* 13 Wn. App. 71, 74, 533 P.2d 389 (1975); *State v. Whalon,* 1 Wn. App. 785, 791, 464 P.2d 730 (1970); *State v. Herrera,* 92 N.M. 7, 582 P.2d 384 (1978).

Next, defendant contends that his statement to police, in which he admitted that the victim remained alone with him in his apartment on May 7 after her family left, should not have been admitted in evidence because it does not contain a confession of any crime. Defendant overlooks the rule that a court is free to admit statements by an accused which tend to show a connection with conditions or events tending to connect the accused with the crime charged. *State v. Peterson,* 2 Wn. App. 464, 469 P.2d 980 (1970). Defendant's statement very strongly connected him with the crime charged in this case because it refuted any defense of alibi and corroborated other circumstantial and direct evidence presented by the State.

Finally, defendant argues that the State should not have been allowed to call both Detective Hansen and the advocate from the Rape Relief organization as rebuttal witnesses to testify that the victim had told each of them in separate interviews that she had asked the defendant to let her go home prior to his having intercourse with her. This testimony was allowed in after defense counsel had conducted a very vigorous cross–examination of the victim in which she admitted that in an interview prior to trial she did not tell counsel that she had asked the defendant to let

her go home. She also conceded that in that same interview she had stated she made no verbal protestations to the defendant and that she was not initially fearful of the defendant when she was left alone with him at the apartment. When pressed by defense counsel to state whether her testimony on direct was true or whether her statements to him during the pretrial interview were true, she seemed to recant her testimony on direct and agree that her prior statements to defense counsel were the accurate version of what occurred in defendant's apartment.

On redirect, the prosecutor asked the victim why she appeared to change her testimony and she stated that defense counsel's questions had confused her. The State then was allowed to put on testimony by the Rape Relief advocate and Detective Hansen to show that the victim had made prior statements consistent with her testimony on direct.

■ When a witness' credibility has been seriously attacked in such a way as to imply a recent fabrication of his testimony, his credibility may be reestablished through the use of prior consistent statements provided the prior consistent statements were made under circumstances minimizing the risk that the witness foresaw the legal consequences of his statement. *State v. Epton,* 10 Wn. App. 373, 377, 518 P.2d 229 (1974). Unquestionably, defense counsel's forceful cross–examination created the implication that the witness had recently fabricated her testimony concerning her expressions of nonconsent. It was, therefore, appropriate that the State be allowed to show that the victim had made statements consistent with her testimony on direct. These statements were not introduced for the purpose of proving the truth of the matters asserted therein, but simply to dispel the implication that her testimony on direct was a recent fabrication. *See Sweazey v. Valley Transport, Inc.,* 6 Wn.2d 324, 107 P.2d 567, 111 P.2d 1010, 140 A.L.R. 1, 20 (1940). We find no evidence that the witness could have foreseen the legal consequences of her statements in the sense that she was fortifying herself to meet an

expected impeachment. The statements were made soon after the incident and prior to the inconsistent statements by a witness who was admittedly unsophisticated or had below average intelligence. *Sweazey v. Valley Transport, Inc., supra* at 336. *See State v. Pitts,* 62 Wn.2d 294, 382 P.2d 508 (1963); *State v. Wolf,* 40 Wn.2d 648, 653–54, 245 P.2d 1009 (1952); *State v. Murley,* 35 Wn.2d 233, 238, 212 P.2d 801 (1949); Annot., 75 A.L.R.2d 909, 946 (1961).

The judgment is affirmed.

PETRIE and REED, JJ., concur.

Reconsideration denied May 9, 1979.