IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

STATE OF WASHINGTON, ) No. 78291-6-I
)
Respondent, )
)
v. )
) UNPUBLISHED OPINION
NIGEL TYRONE GREER, )
) FILED: November 18, 2019
Appellant. )
_____ )

VERELLEN, J. — A jury convicted Nigel Greer of three counts of rape of a child in the second degree. He claims the trial court impermissibly commented on the evidence and challenges several evidentiary rulings. He also challenges several conditions of community custody imposed at sentencing. We affirm Greer's convictions but remand for the court to strike conditions of community custody numbers 5, 12, and 16.

## FACTS

In 2015, 20-year-old L.S.M., who was living in Louisiana, called the King County Sheriff's Office to report that she had been repeatedly sexually abused by Nigel Greer during a period of time when she lived with him in the Seattle area as a young teenager.

Two years later, in 2017, the State charged Greer with three counts of second degree rape of a child.[1] The State alleged that the sexual assaults took place between January 1, 2008 and September 1, 2009.

According to the testimony at Greer's trial, the incidents took place during the period of approximately one year when L.S.M. lived with Greer, his then-girlfriend Annaka, and their infant child in an apartment in Skyway.[2] L.S.M. had a complicated and difficult history prior to her arrival in Washington. When she was seven years old and living in California with her mother and one of her brothers, L.S.M.'s mother passed away. After her mother's death, L.S.M. stayed with different relatives on a short-term basis and eventually went to live in New Orleans with Lorenza Arnold, a great aunt she had never met. Approximately two years later, L.S.M. and Arnold were displaced by Hurricane Katrina and relocated to Texas.

L.S.M. has 12 half-siblings, including Greer, who is approximately 20 years older than L.S.M. L.S.M. met Greer on a few occasions before her mother passed away. When L.S.M. was about 12 years old and living in Texas, she reached out to Greer, and they began to talk regularly over the telephone.

According to L.S.M., around the same time, her previously good relationship with her aunt became strained. As a result of a misunderstanding, Arnold told L.S.M. she could move to Washington to live with Greer, who had

---

[1] The State initially charged Greer with a single count.

[2] To avoid confusion, we refer to Annaka Greer by her first name.

agreed to take her in. At the time, L.S.M. felt that her aunt was sending her away, not merely giving her the option. When she left Texas, L.S.M. did not think she would be welcome to return to her aunt's household.[3] Although upset about the situation with Arnold, L.S.M. was also excited by the prospect of getting to know an older brother.

L.S.M. arrived in Seattle in early July 2008. She was a petite 13-year-old and was about to enter the eighth grade.

According to L.S.M., the reunion with Greer initially went well. However, the day after she arrived, Greer raped her. L.S.M. testified that she and Greer were alone in the apartment after he returned from work, and they began playing and wrestling. Greer pinned L.S.M. on the couch, then removed her pants and had vaginal intercourse with her. L.S.M. did not resist or try to get away. She "zoned out and waited for it to be finished."[4] After ejaculating on her stomach, Greer told L.S.M. to clean herself up. When L.S.M. came out of the bathroom, Greer was playing a video game and said nothing about what happened. A few days later, when L.S.M. and Greer were alone, Greer mentioned that L.S.M. did not bleed and asked about her prior sexual experience.

---

[3] L.S.M.'s aunt remembered the departure differently. Arnold testified that L.S.M.'s decision to move was not based on any discord but simply on the desire of L.S.M. and Greer to know each better. Since Arnold was not L.S.M.'s legal guardian, she felt she could not prevent her from going to live with him.

[4] Report of Proceedings (RP) (Feb. 27, 2018) at 797.

L.S.M. testified that during the 10 months that followed, Greer sexually assaulted her three or four times a week, and more frequently if Annaka was menstruating. L.S.M. said it usually happened at night, after Annaka and the baby went to sleep. In addition to the first incident, L.S.M. described numerous specific incidents of abuse, including incidents of anal and oral intercourse.

During the year she lived in Seattle, L.S.M. did not tell anyone about the abuse, even though she had her own telephone, attended school, and had fairly regular contact with her aunt. She feared that she would be placed in foster care or that she would become the target of Greer's violence. While she did not display any overt resistance, she wore baggy clothing as "protection" and did not do anything that would make herself attractive.

Greer was absent from the household for a period of time starting in May 2009.[5] Around six weeks to eight weeks after he left, L.S.M. called Arnold and told her that she had been "molested."[6] L.S.M. seemed to be "nervous" and "frightened" during the telephone call.[7] Arnold purchased an airplane ticket and arranged for L.S.M. to return to Texas within a few days.

L.S.M. was greatly relieved to leave and to be reunited with her aunt, but she was still reluctant to reveal exactly what happened and struggled to adjust. In

---

[5] Greer was incarcerated in jail, but in accordance with the parties' stipulation, the State presented only evidence that Greer was living out of the home for a period of time and not expected to return, and did not elicit evidence about his incarceration.

[6] RP (Mar. 1, 2018) at 1044.

[7] Id.

4

2015, she reconnected with Annaka, who had separated from Greer, and who encouraged her to make a police report.

At trial, Greer did not testify or present any witnesses. The jury convicted Greer as charged. The court imposed an indeterminate standard range sentence with a minimum term of 194 months. Greer appeals.

## ANALYSIS

### Comment on the Evidence

Greer argues that his convictions must be reversed because the trial court improperly commented on the evidence.

L.S.M. was the State's primary witness. After the trial court judge swore her in and directed her to be seated at the witness stand, the court stated, "And the first question is by far the easiest one. Can you just tell me your full name and spell your last name?"[8] L.S.M. provided her full name, and the court informed her that her testimony would begin with questions from the prosecutor.

Before the jury returned following the first break in L.S.M.'s testimony, defense counsel moved for a mistrial, arguing that although it was likely not the court's intent, the comment about the first question being the easiest communicated an opinion about L.S.M.'s credibility and the "validity" of her testimony.[9] The court denied the motion, stating that the "very minor comment,

---

[8] RP (Feb. 27, 2018) at 744.
[9] Id. at 759.

5

trying to help an obviously frightened witness just settle into the witness stand" was not a comment on the evidence.[10]

Greer contends that a mistrial was warranted because, regardless of the court's subjective motivations, the court "subtly but powerfully endorsed" the State's argument that L.S.M. would be testifying about "difficult matters that she actually experienced."[11]

Article IV, section 16 of the Washington Constitution states that "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." In other words, judges are prohibited from commenting on the evidence.[12] A statement by the court constitutes a comment on the evidence if a jury can infer the court's attitude toward the merits of the case or its evaluation of a disputed issue.[13] If the trial court does comment on the evidence, those comments are presumed prejudicial.[14]

None of the cases Greer cites are factually analogous.[15] And we are unpersuaded that, viewed in context, the court's isolated remark about the first

---

[10] Id. at 760.

[11] Appellant's Br. at

[12] State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006).

[13] State v. Lane, 125 Wn.2d 825, 838, 889 P.2d 929 (1995).

[14] Levy, 156 Wn.2d at 723.

[15] See Lane, 125 Wn.2d at 837 (court's oral comment on a disputed evidentiary issue improperly removed issue from the jury's determination); see also Levy, 156 Wn.2d at 721 (instruction that factual matters were established as a matter of law).

question being the "easiest" was anything other than a mere pleasantry. The court's statement neither expressed nor implied a judgment with regard to her anticipated testimony or L.S.M.'s credibility.

The trial court specifically instructed the jurors that they were the sole judges of credibility, that the court could not comment on the evidence, that it had not intentionally done so, and that the jury should disregard any comment by the trial court that, in the jury's estimation, appeared to be a comment on the evidence. These instructions militated against any possibility that the jury misconstrued the court's remark as a comment on the evidence.[16] To be sure, it is conceivable that under more extreme circumstances, a court's statements or conduct aimed at reassuring a complaining witnesses could rise to the level of conveying a personal opinion about the veracity of the victim's allegations. Those circumstances are not present here.

### Evidence of Prior Sexual Abuse

Greer argues that the trial court abused its discretion in allowing the State to present unfairly prejudicial evidence that L.S.M. experienced sexual abuse as a young child. In accordance with the court's pretrial ruling, the State did not ask

---

[16] See State v. Elmore, 139 Wn.2d 250, 276, 985 P.2d 289 (1999) (same instruction cured any potential article IV, section 16 violation where the defendant appeared in shackles during voir dire); accord State v. Ciskie, 110 Wn.2d 263, 283, 751 P.2d 1165 (1988).

L.S.M. about the details of the abuse. L.S.M. testified only that the perpetrators were "strangers, friends, [her] mother's boyfriends, family members."[17]

Under ER 403, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We review a trial court's ruling on the admissibility of evidence for a manifest abuse of discretion.[18] We will overturn the court's determination on relevance or prejudice only if no reasonable person would adopt the same view as the court.[19]

Greer argues that the trial court applied the wrong legal standard. He maintains the evidence was not relevant and unfairly appealed to the jury's sympathies and encouraged a decision based on emotion, rather than the evidence.

The record does not support the contention that the trial court applied ER 404(b), pertaining to the admission of evidence of prior bad acts, instead of ER 403. Both parties presented arguments under ER 403, and the court expressly acknowledged that ER 404(b) did not apply. The court's assessment that the prejudice to Greer was "limited," largely because the evidence of prior abuse did not implicate him, does not suggest any confusion about which rule applied. The

---

[17] RP (Feb. 27, 2018) at 751.

[18] State v. Johnson, 185 Wn. App. 655, 670, 342 P.3d 338 (2015).

[19] Id. at 670-71 (quoting State v. Posey, 161 Wn.2d 638, 648, 167 P.3d 560 (2007)).

8

evidence was relevant because it helped to explain why, for many months when L.S.M. lived in Greer's household, she took no overt actions to stop the rapes and did not reveal the abuse. L.S.M. explained at several points that she had internalized the victimization:

> [T]elling somebody just was not an option for so many reasons, whether it was safety, whether it was shame, whether it's because I felt like I deserved it, so I suffered in silence, it just—why not? I've been doing it all my life. It's the norm. It's the expectation. Just lay there and take it.[20]

The record demonstrates that the trial court properly weighed the evidence and concluded that its probative value was not substantially outweighed by its prejudicial impact. Particularly in light of the limited nature of the evidence, the trial court's ruling was not an abuse of discretion.

### Fact of Complaint

Greer also challenges the trial court's admission of Arnold's testimony recounting L.S.M.'s statement in the July 2009 telephone conversation that she had been "molested."

The trial court admitted the testimony under the "fact of complaint" rule, also known as the "hue and cry" doctrine, which allows the State in criminal sexual assault cases to present evidence that the victim complained to someone within a reasonable time after the assault.[21] The rationale for this doctrine is to dispel the feudal notion that a person who does not disclose shortly after being sexually

---

[20] RP (Feb. 28, 2018) at 1331.
[21] State v. Ferguson, 100 Wn.2d 131, 144, 667 P.2d 68 (1983).

assaulted must be fabricating the story.[22] "The evidence is not hearsay because it is introduced for the purpose of bolstering the victim's credibility and is not substantive evidence of the crime."[23]

For a disclosure to be admissible under the rule, it must be made within a reasonable amount of time after the assault.[24] Greer argues that L.S.M.'s statement to Arnold was not timely, as required by the exception. He points out that L.S.M. did not mention the abuse until approximately a year after the assaults allegedly began and until at least a month after he was no longer residing in the home.

We review a trial court's interpretation of an evidentiary rule de novo as a question of law and review the decision to admit evidence for an abuse of discretion.[25] An abuse of discretion occurs when "'the trial court's decision is manifestly unreasonable or based on untenable grounds or reasons, such as a misconstruction of a rule.'"[26]

As the trial court ruled, the relevant interval for determining whether L.S.M.'s complaint was timely was the interval between Greer's arrest and the telephone call. Due to violence in the home and safety considerations, Greer's

---

[22] State v. Bray, 23 Wn. App. 117, 121-22, 594 P.2d 1363 (1979).

[23] Id. at 121.

[24] Ferguson, 100 Wn.2d at 135-36; State v. Chenoweth, 188 Wn. App. 521, 532, 354 P.3d 13 (2015).

[25] State v. Gunderson, 181 Wn.2d 916, 921-22, 337 P.3d 1090 (2014).

[26] Id. at 922 (internal quotation marks omitted) (quoting State v. Brown, 132 Wn.2d 529, 572, 940 P.2d 546 (1997)).

departure from the household presented L.S.M.'s first viable opportunity to complain. The court determined that, according to the record, Greer was arrested on May 24, 2009, and the telephone call occurred sometime in July. The court further determined that although there were a "number of weeks" between Greer's departure and the disclosure, the complaint was timely under the circumstances, given L.S.M.'s age and the likelihood that she would feel compelled to "wait and see if Mr. Greer going to stay in jail."[27]

Greer insists that a disclosure made more than a month following an incident of abuse cannot be considered timely under the hue and cry doctrine. But he cites no authority that persuasively supports this position. For instance, in State v. DeBolt, the court admitted the testimony about a disclosure which occurred the day after a specific incident of abuse.[28] However, the abuse had been ongoing for several years before the incident that spurred the disclosure. Although our case law has not defined a bright line rule for the timing of the disclosure under the hue and cry doctrine, longer delays have been held to be untimely.[29]

Greer also claims that, regardless of the specific length of time, L.S.M.'s complaint was inadmissible because she had an opportunity to deliberate and

---

[27] RP (Feb. 1, 2018) at 200.

[28] 61 Wn. App. 58, 60, 808 P.2d 794 (1991).

[29] See Chenoweth, 188 Wn. App. at 533 (disclosure nearly a year after assault was not reasonably timely); see also State v. Griffin, 43 Wash. 591, 598, 86 P. 951 (1906) (complaint six months after assault was not sufficiently timely).

reflect that is incompatible with the purpose of the hue and cry doctrine. But lack of opportunity to deliberate is not a criteria for admission under the hue and cry rule; "evidence of the complaint should be excluded whenever from delay or otherwise it ceases to have corroborative force."[30] The trial court did not abuse its discretion in its assessment that L.S.M.'s disclosure was corroborative, and we reject the invitation to import standards applicable to the excited utterance exception to the hearsay rule.[31]

Even assuming L.S.M.'s disclosure to Arnold was not timely and therefore not admissible under the fact of complaint rule, any error was harmless. Evidentiary error is grounds for reversal only if, within reasonable probabilities, the error affected the outcome of the trial.[32] "Improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the evidence as a whole."[33] Arnold's testimony did not materially affect the outcome. Consistent with the limitations of the hue and cry doctrine, Arnold testified only as to the fact of complaint. She reported no details beyond the fact that L.S.M. said she had been molested. While corroborative, Arnold's testimony was of relatively minor significance in view of L.S.M.'s detailed and extensive

---

[30] Griffin, 43 Wash. at 598.

[31] See State v. Davis, 141 Wn.2d 798, 843, 10 P.3d 977 (2000) (excited utterance exception is based on the theory that a spontaneous reaction is unlikely to be the result of conscious fabrication).

[32] State v. Neal, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001).

[33] Id.

12

testimony about the assaults and the corroboration provided by Annaka's testimony and other aspects of Arnold's testimony. And admission of L.S.M.'s complaint to Arnold in July 2009 did not prevent the defense from arguing that during the year she lived in Seattle, L.S.M. had the means and opportunity to report what was happening to numerous people.

## ER 404(b) Evidence

Greer next claims the trial court abused its discretion in admitting evidence of prior bad acts under ER 404(b).

Evidence of a person's prior bad acts is generally not admissible to prove that he acted in conformity with his character on a particular occasion.[34] However, evidence of a person's prior acts may be admissible for other purposes, including to prove motive, opportunity, or intent.[35] ER 404(b) evidence of violence is admissible to explain a victim's delay in reporting sexual abuse and to rebut the suggestion that the failure to report implies that the abuse did not occur.[36]

Based on the parties' pretrial arguments, the court admitted three specific incidents involving firearms and violence that L.S.M. and Annaka described in interviews. As with the evidence of prior sexual abuse, the State relied on these incidents to explain, in part, why L.S.M. did not report the abuse while it was ongoing. Specifically, the court admitted evidence about two incidents L.S.M.

---

[34] ER 404(b); State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012).
[35] ER 404(b).
[36] State v. Wilson, 60 Wn. App. 887, 891, 808 P.2d 754 (1991).

witnessed in which Greer assaulted Annaka, hurled abuse at her, made violent threats, and brandished weapons. The court admitted a separate incident in which Greer, holding a firearm, asked L.S.M. if she had ever been "pistol whipped."[37]

First, Greer argues that the trial court's admission of these incidents to explain delay in reporting was inconsistent with its admission of L.S.M.'s disclosure to her aunt as a timely complaint under the hue and cry doctrine. In other words, Greer claims that the court found there was no delay in reporting and therefore, the ER 404(b) evidence was not admitted for any relevant purpose. Greer is mistaken. As explained, because L.S.M. did not report any abuse while the abuse was ongoing, for almost a year, the court admitted evidence that was relevant to explain that delay. However, the court determined that after Greer left the household, L.S.M. made a timely complaint. The court's rulings were consistent.

Second, relying on State v. Fisher,[38] Greer claims the court erred by allowing admission of the ER 404(b) evidence without regard to whether or not he first made an issue of delay. But while the trial court in Fisher ruled that ER 404(b) evidence would be admissible only if the defense first raised the issue of the victim's delayed reporting, nothing in Fisher required the trial court here to similarly condition the admission of the evidence. Moreover, when pressed by the trial court, the defense acknowledged that the timing of disclosures would be a relevant

---

[37] RP (Feb. 27, 2018) at 813.
[38] 165 Wn.2d 727, 745, 202 P.3d 937 (2009).

14

issue, as would the circumstances and people who the victim had access to prior to those disclosures. The court did not abuse its discretion.[39]

### Conditions of Community Custody

Greer challenges four conditions of community custody imposed at sentencing.

Sentencing courts have authority to impose crime-related prohibitions and affirmative conditions of community custody.[40] A crime-related prohibition directly relates to the crime of conviction.[41] "[B]ecause the imposition of crime-related prohibitions is necessarily fact-specific and based upon the sentencing judge's in-person appraisal of the trial and the offender, the appropriate standard of review [is] abuse of discretion.[42] The State need not establish that the prohibited conduct directly caused the offense.[43] "So long as it is reasonable to conclude that there is a sufficient connection between the prohibition and the crime of conviction, we will not disturb the sentencing court's community custody conditions."[44]

---

[39] Because we conclude that Greer has failed to establish any error with respect to his trial, his claim of cumulative error likewise fails.

[40] RCW 9.94A.030(1), .703.

[41] RCW 9.94A.030(10).

[42] In re Pers. Restraint of Rainey, 168 Wn.2d 367, 374-75, 229 P.3d 686 (2010).

[43] State v. Nguyen, 191 Wn.2d 671, 685, 425 P.3d 847 (2018).

[44] Id. at 685-86.

## No Sexual Contact

Greer first challenges condition number 5, that he "[i]nform the supervision [community corrections officer (CCO)] and sexual deviancy treatment provider of any dating relationship. Disclose sex offender status prior to sexual contact. Sexual contact in a relationship is prohibited until the treatment provider approves of such."[45] Greer contends the prohibition on sexual contact in a relationship without prior approval of a CCO or treatment provider is not crime-related. The State concedes that the prohibition is not related to Greer's offenses. We accept the State's concession and remand for the sentencing court to strike the prohibition.

## No Contact with Minors

Greer next challenges condition number 16, which prohibits all "direct and/or indirect contact with minors."[46] Greer claims the court abused its discretion by imposing this condition as it prohibits all contact with his own biological children and is not narrowly tailored and lacks an explanation as to why prohibiting such contact is necessary to realize a compelling state interest.[47]

Although the State argues that Greer waived any claim of error by failing to object, conditions of community custody may be challenged for the first time on

---

[45] Clerk's Papers (CP) at 85.

[46] CP at 86.

[47] According to the testimony at trial, Greer has at least four biological children.

appeal.[48] Because Greer has a fundamental constitutional right to parent, the sentencing court's discretion to impose conditions that interfere with that right is subject to limitations.[49] "'Conditions that interfere with fundamental rights must be "sensitively imposed" and "reasonably necessary" to accomplish the essential needs of the State and public order.'"[50] The sentencing court's obligation to sensitively impose a restriction on a fundamental right "is not satisfied merely because, at some point and for some duration, the restriction is reasonably necessary to serve the State's interests."[51]

In In re Personal Restraint of Rainey, our Supreme Court struck down a lifetime no-contact order prohibiting Rainey from all contact with his child when the sentencing court did not articulate any reasonable necessity for the lifetime duration of that order.[52] Recognizing the "fact-specific nature of the inquiry," the court remanded to the trial court for resentencing so that the court could "address the parameters of the no-contact order under the 'reasonably necessary' standard."[53]

---

[48] State v. Wallmullar, ___ Wn.2d ___, 449 P.3d 619, 621 (2019); State v. Bahl, 164 Wn.2d 739, 744, 193 P.3d 678 (2008).

[49] See Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (parents have a fundamental liberty interest in the care, custody, and control of their children).

[50] Rainey, 168 Wn.2d at 377 (internal quotation marks omitted) (quoting State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008)).

[51] Id. at 381.

[52] 168 Wn.2d at 381-82.

[53] Id. at 382.

Although the condition at issue here is not a lifetime no-contact order, the parameters of a condition affecting a parent's fundamental right to the care, custody, and companionship of his minor children must still be addressed. "The question is whether, on the facts of this case, prohibiting all contact with [the defendant's minor children], including indirect or supervised contact, is reasonably necessary to realize [a compelling State interest]."[54] In order for a condition prohibiting all contact with biological children to be constitutionally valid, "[t]here must be no reasonable alternative way to achieve the State's interest."[55]

It is not clear whether the sentencing court here intended to prohibit all contact with minors. At sentencing, the court orally indicated that in addition to ordering no contact with L.S.M., it would order no contact with minors "without the supervision of a responsible adult who has knowledge of this conviction and the sentencing order of the [c]ourt."[56] That condition is not set forth in the judgment and sentence. The record is unclear as to the intended scope and lacks an explanation whether a blanket prohibition on all contact is reasonably necessary to realize the compelling State interest in protecting children from harm.

The requirements of Rainey and related cases were not brought to the court's attention, and there is nothing in the record to suggest that the court recognized the limits on its authority and the need to apply the "reasonably

---

[54] Id. at 379.

[55] Warren, 165 Wn.2d at 34-35.

[56] RP (Apr. 13, 2018) at 1210-11.

18

necessary" standard. Accordingly, we strike the sentencing condition prohibiting contact with all minors and remand to the trial court to consider whether prohibiting Greer from all contact with his children is reasonably necessary under the principles discussed above.

### Urinalysis/Breath Analysis

Greer next challenges condition number 12, which requires him to "[b]e available for and submit to urinalysis and/or breath analysis upon request of the CCO and/or the chemical dependency treatment provider."[57]

The sentencing court imposed a standard condition requiring Greer to refrain from possessing or consuming controlled substances except where lawfully prescribed.[58] The court also imposed a discretionary condition prohibiting Greer from consuming alcohol.[59] Greer does not challenge the imposition of either of these conditions.

Nevertheless, Greer contends condition number 12 is not related to his offense of conviction and violates his privacy interests under article I, section 7 of the Washington Constitution.[60] He argues that drug and alcohol testing is constitutional only where it promotes rehabilitation, as where the defendant has

---

[57] CP at 86.

[58] See RCW 9.94A.703(2)(c) (condition shall be imposed unless waived by the court).

[59] See RCW 9.94A.703(3)(e) (permits court to prohibit offenders from possessing or consuming alcohol).

[60] WASH. CONST. art. I, § 7 provides, in relevant part: "No person shall be disturbed in his [or her] private affairs . . . without authority of law."

been convicted of a drug offense or an offense of driving under the influence (DUI). The State argues that because the court lawfully prohibited Greer's use of drugs and alcohol, it may require him to submit to urinalysis and breath analysis to monitor compliance with these conditions of sentence.

Both parties rely on State v. Olsen, in which the Washington State Supreme Court upheld suspicionless urinalysis for probationers convicted of DUI.[61] Our Supreme Court held that individuals on probation do not forfeit all expectations of privacy in exchange for their release into the community.[62] While the State may closely supervise to advance the probation system's goals of promoting rehabilitation and protecting public safety, its authority is subject to limits.[63] The State may infringe upon individuals' privacy interest "only to the extent 'necessitated by the legitimate demands of the operation of the [community supervision] process.'"[64]

The court in Olsen held that the intrusion on probationers' privacy interests is only lawful when narrowly tailored to meet a compelling State interest.[65] Requiring random urinalyses was permissible in Olsen because the State has a significant interest in supervising probationers when the condition was narrowly

---

[61] 189 Wn.2d 118, 134, 399 P.3d 1141 (2017).

[62] Id. at 125.

[63] Id. at 128-29.

[64] Id. at 125 (quoting State v. Parris, 163 Wn. App. 110, 117, 259 P.3d 331 (2011)).

[65] Id. at 127-28.

20

tailored to address the specific offense of conviction.[66] The court stated that "random UAs [urinalyses], under certain circumstances, are a constitutionally permissible form of close scrutiny of DUI probationers."[67]

Central to the holding of Olsen was the State's compelling interest in monitoring the rehabilitation of DUI offenders to assess their progress toward rehabilitation and compliance with treatment.[68] Because Olsen was convicted of "a crime involving the abuse of drugs and alcohol," she could "expect to be monitored for consumption of drugs and alcohol, but should not necessarily expect broader-ranging intrusions that expose large amounts of private information completely unrelated to the offense."[69]

Olsen does not support the general proposition that suspicionless breath analysis and urinalysis is constitutional to monitor conditions imposed under RCW 9.94A.703(2) and (3) that need not be crime-related. Greer was not convicted of a drug or DUI offense. The State points to L.S.M.'s testimony about two occasions when Greer furnished drugs and alcohol to her and argues that this evidence would support the imposition of crime-related conditions prohibiting Greer's consumption of drugs and alcohol.[70] But even if true, this does not establish that

---

[66] Id. at 128-29.

[67] Id. at 134.

[68] Id. at 128-29.

[69] Id. at 133.

[70] L.S.M. testified about a time when Greer gave her a pill from a "party pack," which he described as a "mood enhancer." RP (Feb. 27, 2018) at 841. After taking it, L.S.M. drove around with Greer and felt "good." Id. L.S.M. recalled

Greer, like Olsen, could expect infringement on his privacy rights in order to monitor compliance with conditions that do not relate to essential facts of his conviction and are not causally connected to the crimes of conviction.[71] In contrast to the circumstances in Olsen, breath analysis and urinalysis testing would not necessarily reveal anything about Greer's progress or rehabilitation with respect to the crimes of conviction because there was no evidence of his use of drugs and alcohol that was connected to the assaults.

We conclude that condition number 12 is neither narrowly tailored nor reasonably necessary to achieve a compelling state interest and must be stricken.

### Areas Where Children's Activities Occur

Finally, Greer argues that condition number 18, which bars him from entering locations where children's activities regularly occur, is unconstitutionally vague. Condition number 18 requires him to

> [s]tay out of areas where children's activities regularly occur or are occurring. This includes parks used for youth activities, schools, daycare facilities, playgrounds, wading pools, swimming pools being used for youth activities, play areas (indoor or outdoor), sports fields being used for youth sports, arcades, and any specific location identified in advance by [the Department of Corrections] or CCO.[72]

---

another instance when she smoked "weed," and Greer provided an alcoholic drink. Id. at 841-82. She testified that there was no physical contact on these occasions.

[71] See Nguyen, 191 Wn.2d at 683, 685.

[72] CP at 86.

Due process guarantees that laws not be vague, meaning that citizens must be afforded fair warning of proscribed conduct.[73] A condition of community custody is unconstitutionally vague if it does not provide ordinary people fair warning of the proscribed conduct and does not have standards that are definite enough to protect against arbitrary enforcement.[74] "Unconstitutional vagueness" means that persons of ordinary intelligence must guess as to the proscribed conduct.[75] If persons of ordinary intelligence can understand what the condition proscribes, notwithstanding some possible areas of disagreement, the condition is sufficiently definite.[76]

Greer contends the phrase "areas where children's activities regularly occur" is unconstitutionally vague because it is not clear with respect to physical distance or as to what constitutes a regular occurrence. He also claims the condition is unconstitutionally vague because it is unclear whether the terms "youth" and "children" are synonymous.

Our Supreme Court recently rejected a vagueness challenge with respect to a community custody condition similar to the one at issue here.[77] The condition at issue provided that "[t]he defendant shall not loiter in nor frequent places where

---

[73] U.S. CONST. amend. XIV, § 1; WASH. CONST. art. 1. § 3.

[74] See State v. Irwin, 191 Wn. App. 644, 652-53, 364 P.3d 830 (2015).

[75] City of Spokane v. Douglass, 115 Wn.2d 171, 179, 795 P.3d 693 (1990).

[76] See Bahl, 164 Wn.2d at 752-54.

[77] Wallmuller, 449 P.3d at 620.

children congregate such as parks, video arcades, campgrounds, and shopping malls."[78]

Concluding that this condition is not unconstitutionally vague, the court relied in large part on the "overwhelming consensus among federal courts" addressing similar conditions and "uniformly" upholding conditions barring offenders from places frequented by children in conjunction with a nonexclusive illustrative list of examples.[79] The court concluded that where a list of examples elucidates a general phrase, such as "where children congregate," the restrictive condition, read as a whole, provides fair notice of the prohibited conduct.[80] Noting that due process does not require "impossible standards of specificity," the court concluded that language which may be vague standing alone becomes "sufficiently specific" when clarified by a list of examples to illustrate the scope.[81]

Condition number 18 provides a level of detail that withstands constitutional scrutiny under Wallmuller. The phrase "areas where children's activities regularly occur or are occurring" in the first sentence modifies a lengthy illustrative list of prohibited locations in the second sentence. "Areas where children's activities regularly occur" is no less precise than "places where children congregate." Read

---

[78] Id.

[79] Id. at 622.

[80] Id. at 623 (quoting United States v. Paul, 274 F.3d 155, 167 (5th Cir. 2001)).

[81] Id. (quoting City of Seattle v. Eze, 111 Wn.2d 22, 26-27, 759 P.2d 366 (1988)).

in a "commonsense" manner, the language is specific enough so that a person of ordinary intelligence can understand the scope of the prohibition.[82] Condition number 18 is not unconstitutionally vague.

We remand for the sentencing court to strike that portion of condition number 5 prohibiting sexual contact in a relationship and to strike condition number 12 in its entirety. We remand for the court to strike condition number 16 and impose a new condition after reconsideration consistent with this opinion. We otherwise affirm the convictions and sentence.

WE CONCUR:

_____

_____

Leach, J.

Appelwick, C.J.

---

[82] Wallmuller, 449 P.3d at 624.

25